UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DANIEL D. WENDEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 1:14-cv-01498-TWP-DML |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of the Social Security, | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## Report and Recommendation on
## Complaint for Judicial Review

This matter was referred to the Magistrate Judge under 28 U.S.C.

§ 636(b)(1)(B) and Fed. R. Civ. P. 72(b) for a report and recommendation as to its

appropriate disposition. As addressed below, the Magistrate Judge recommends

that the District Judge REVERSE AND REMAND the decision of the Commissioner

of the Social Security Administration that plaintiff Daniel D. Wendel is not

disabled.

## Introduction

Mr. Wendel applied in June 2012 for Supplemental Security Income

disability benefits (SSI) under Title XVI of the Social Security Act, alleging that he

has been disabled since June 1, 2002.  Acting for the Commissioner of the Social

Security Administration following a hearing held by videoconference on May 16,

2013, administrative law judge Roxanne Fuller issued a decision on May 30, 2013,

finding that Mr. Wendel is not disabled.  The Appeals Council denied review of the

ALJ's decision on July 12, 2014, rendering the ALJ's decision for the Commissioner final.  Mr. Wendel timely filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's decision.

Ms. Wendel contends the Commissioner's decision must be reversed and remanded because the ALJ's evaluation of the severity of his mental impairments and their effect on his functioning is not supported by substantial evidence.

The court will first describe the legal framework for analyzing disability claims and the court's standard of review.  The court will then provide background information about Mr. Wendel, describe the ALJ's findings, and analyze the ALJ's decision based on the standard of review.

## Standard for Proving Disability

To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  Mr. Wendel is disabled if his impairments are of such severity that he is not able to perform the work he previously engaged in and, if based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy.  42 U.S.C. § 1382c(a)(3)(B). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability.  20 C.F.R. § 404.1520.

2

Step one asks if the claimant is currently engaged in substantial gainful activity; if he is, then he is not disabled.  Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then he is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c). The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  The Listing of Impairments includes medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then his residual functional capacity (RFC) is determined for purposes of steps four and five.  RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations.  20 C.F.R. § 404.1545.  At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled.  The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on his vocational profile (age, work experience, and education) and his RFC; if so, then he is not disabled.

The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given his age, education, work experience, and functional capacity. 20 C.F.R. § 404.1560(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

### Standard for Review of the ALJ's Decision

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are supported by substantial evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard demands more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for her decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## Analysis

**I.     Summary of Biographical, Mental Health, and Educational Background**

Mr. Wendel was born in 1992 and was 19 years old when he filed his application for SSI disability benefits.  He began treatment for psychiatric problems as early as age 8, including with therapy and medication.  (R. 359).  In 2004, at the age of 12, he was hospitalized for about five days because of acute psychiatric issues and immediately thereafter underwent an intensive outpatient treatment program for about three weeks.  (*See* R. 358 and 367).  His treatment plan goals included "decreasing impulsive behavior, abstaining from aggressive behavior, increasing coping skills, and increasing behavior compliance at home."  Mr. Wendel had difficulties working toward these goals.  (R. 367; 368: "coping skills remains an issue . . . particularly when [he] is overwhelmed or angry").  At the time, Mr. Wendel lived with his father and step-mother; his biological mother had not been a part of his life since he was age 5.  (R. 359).

At some point before March 2010, Mr. Wendel became a ward of the Marion County, Indiana Department of Child Services.  (*See* R. 192).  In March 2010, he began living at a residential facility (Damar), which specializes in the care and treatment of children with severe mental health issues.  At that time, he was diagnosed with a mood disorder NOS (not otherwise specified), ADHD NOS, oppositional defiant disorder, and autistic disorder.  (R. 192).  After arriving at Damar, Mr. Wendel had limited further contact with his father and step-mother, and as of early 2011, that contact essentially ceased.  (R. 193).  In July 2011, at age

19, Mr. Wendel was "transitioned" from living at Damar to living at a residential group home for adults in Kokomo, Indiana, run by a mental health services organization called Bona Vista.  (R. 194, 232).  Mr. Wendel received "24/7" supervision by Bona Vista staff in a highly regimented environment and had regular visits with medical professionals for managing his medication prescribed for mental impairments.  (*See* R. 197, 199).  His medications treated mood disorder, ADHD, and autism.  (R. 222).

While living in Indianapolis and at Damar, Mr. Wendel was a student at North Central High School.  He attended North Central from 9th through 11th grades.  A school case conference committee report for Mr. Wendel's junior year shows that Mr. Wendel was provided a one-on-one, full-time aide to accompany him to "many of his academic classes," and the assistant "often cues [him] to stay focused and remain on task."  (R. 251, 245).  Mr. Wendel enjoyed auto-detailing and computer courses he took through North Central's vocational program, attended general education classes most of the day (*see* R. 241), but he "struggled to maintain appropriate educational levels" even with after school tutoring.  (R. 193).  He tried to attend summer school in 2011, but North Central "removed him from their program because he was too far behind and they felt he could not benefit from summer school."  (R. 193).  When Mr. Wendel moved to the group home in Kokomo, he enrolled at Kokomo High School for his senior year.

The Kokomo school district prepared a case conference report in November 2011, which summarized information from Mr. Wendel's academic and behavioral

performance at North Central and his needs for 12th grade at Kokomo High School. (*See* R. 241-250).  The report notes Mr. Wendel's interpersonal behavioral problems had improved to the point that a behavioral plan was removed from his individual educational plan.  (R. 241).  It was determined Mr. Wendel likely could not meet state standards to receive a high school diploma because his academic achievement was not at grade level (or close), he had "low average ability levels," and was deemed unable "to function in the general education environment with accommodations."  "Virtual school" was also considered, but rejected based on the opinion of North Central's counselor that Mr. Wendel "would not do well in virtual school because he does not have the ability to focus for long periods of time while on the computer," and based on the counselor's report that Mr. Wendel "was not doing well in the computer class for visual design" when he was at North Central. (R. 245).  Mr. Wendel was described as a person having "trouble focusing for long periods of time" (R. 242 and 245) and as "lack[ing] the skills necessary to function independently in the real world."  (R. 242).  To address Mr. Wendel's circumstances, his IEP included the goals of obtaining a "certificate of completion"[1] and focusing on acquiring independent living skills, including some employment skills.  (R. 242-244).

---

[1]     Under Indiana law, a certificate of completion is not an academic credential but is a certificate a high school may give to intellectually or emotionally-challenged teenagers who complete their high school career and work toward their Individual Education Plan goals.  *See* http://www.doe.in.gov/sites/default/files/student-assistance/certificates-and-diplomas-memo-spring-2014.pdf.

During his senior year at Kokomo High School, Mr. Wendel spent about half the day attending classes and the remainder of the day working in a sheltered employment setting run by Bona Vista. He was awarded a certificate of completion of high school in the summer of 2012, at age 20. (R. 378).

Mr. Wendel reunited with his biological mother in 2012 and moved in with her, her husband, and their child in June 2012. (*See* R. 275). About six months after Mr. Wendel moved into his mother's home, he began intensive mental health counseling services from Meridian Services that lasted through the date of (and presumably beyond) the ALJ's decision.

With this background information about Mr. Wendel, the court now summarizes the ALJ's step one through five findings.

## II.   <u>The ALJ's Sequential Findings</u>

Because Mr. Wendel's assertions of error relate only to the ALJ's evaluation of his mental impairments, the court limits its discussion to those matters and does not address the ALJ's analysis of his physical impairment (a club foot) or its effect on his functioning.

At step one, the ALJ found that Mr. Wendel had not engaged in substantial gainful activity since his application date of June 15, 2012.[2] His earnings record showed earnings of about $175 in 2011 and about $1,000 in 2012, less than that required for substantial gainful activity. (R. 14). At step two, the ALJ identified

---

[2]      Under the SSI program, a claimant who is found disabled cannot receive benefits for any period before the date of his application for benefits, regardless if the onset of disability was before the application date. *See* 20 C.F.R. § 416.335.

the following severe mental impairments:  ADHD, autism, bipolar disorder, and mood disorder.  She concluded, at step three, that the mental impairments either singly or in combination did not equal the severity of any of the mental health listings in the Listing of Impairments.[3]   For purposes of step three, the ALJ found that Mr. Wendel had only mild limitations in daily living activities, moderate difficulties in social functioning and in concentration, persistence, or pace, and he had not experienced episodes of decompensation of extended duration.  (R. 15-16).

The ALJ next determined Mr. Wendel's residual functional capacity, i.e., his maximum work capacity despite his impairments and their effect on his functioning.  She determined Mr. Wendel is capable of performing light work, with the following additional limitations:  (1) no exposure to excessive noise, (2) only simple, routine, and repetitive work, and (3) only superficial interaction with the public, co-workers, and supervisors.  (R. 17).

Mr. Wendel had no past relevant work to assess at step four.  At step five, and based on the testimony of a vocational expert, the ALJ decided Mr. Wendel is capable of performing unskilled jobs as a table worker (DOT #739.687-182), small products assembler (DOT #706.684-022), and in housekeeping (DOT #323.687-014).

---

[3]     The state agency psychologist, Dr. Kari Kennedy, determined on her review of the administrative record as of September 4, 2012, that the medical evidence indicates Mr. Wendel has suffered from a broader list of medically determinable mental impairments:  ADHD, borderline intellectual functioning, bipolar disorder, depression NOS [not otherwise specified], obsessive compulsive disorder, anxiety NOS, intermittent explosive disorder, and Asperger's syndrome.  (R. 287-296). These impairments fall within the same mental health listings that were evaluated by the ALJ:  listings 12.02, 12.04, 12.06, 12.08, and 12.10.  (*See* R. 297).

(R. 22-23).  The vocational expert testified there are 2,500 table worker jobs in the national labor market; 20,000 small products assembler jobs in the national market; and 131,000 housekeeping jobs in the national market.  The ALJ accepted this testimony, and found Mr. Wendel not disabled at step five.  (R. 22-23).

## III.   __Mr. Wendel's Assertions of Error__

Mr. Wendel contends the ALJ erroneously evaluated the severity of his mental impairments and their effect on his functioning.  He argues the evidence established that his mental impairments were severe enough to satisfy the diagnostic criteria of several of the mental health listings, including 12.02 (organic mental disorders), 12.04 (affective disorders), 12.06 (anxiety-related disorders), 12.08 (personality disorders), and 12.10 (autistic disorders).  Each of these listings requires satisfaction of the same B criteria, so it is not necessary to differentiate among the listings for purposes of evaluating Mr. Wendel's arguments. The broad areas of functioning under the B criteria are also used to formulate an RFC.

Mr. Wendel broadly asserts that the ALJ's analysis of the B criteria, for purposes of step three and the formulation of an RFC applied at step five, was grossly flawed, ignored important evidence contrary to conclusions the ALJ made, and improperly focused on Mr. Wendel's overstatement of his abilities while omitting discussion of medical and other objective evidence regarding Mr. Wendel's abilities and regarding his exaggeration of his own abilities and accomplishments. Because of these errors, Mr. Wendel argues that the ALJ's determination Mr. Wendel is not disabled is not supported by substantial evidence.

To address Mr. Wendel's arguments, the court first provides an overview of SSA regulations governing the evaluation of a claimant's mental impairments. The court will then focus its analysis on the ALJ's evaluation of Mr. Wendel's RFC. As will be explained, the court concludes that the ALJ's RFC is not supported by substantial evidence. The ALJ ignored lines of contrary evidence and her evaluation of the RFC is tainted by material flaws in logic. On this basis, the Commissioner's decision must be reversed and remanded. On remand, the severity of Mr. Wendel's mental impairments at step three should also be reconsidered.

## A. SSA Regulations for Evaluating Mental Health Impairments

Mental impairments are evaluated by a "special technique" described in 20 C.F.R. § 404.1520a. The first task is deciding if the claimant has a medically determinable mental impairment. The ALJ decided Mr. Wendel does, and moved to the second task. The second task requires rating "the degree of functional limitation" because of the mental impairment by examining the claimant's functioning in four broad areas:  activities of daily living; social functioning; concentration, persistence, and pace ("CPP"); and episodes of decompensation. These are also the "B" criteria under the mental impairment listings. If based on rating the degree of functional limitation or based on other evidence that a mental impairment "more than minimally" affects the claimant's abilities to perform basic work activities, then the claimant is deemed to suffer from a "severe" medically-determinable mental impairment, 20 C.F.R. § 404.1520a(d)(1), satisfying step two of the sequential analysis.

11

The next task is step three of the sequential analysis, which requires a determination about whether the claimant's mental condition manifests itself at a level of severity measured by the B criteria or, if the B criteria are not satisfied, then whether the "C" criteria for a particular listing is implicated by the evidence. Mr. Wendel has not challenged the ALJ's evaluation of C criteria; his arguments focus only on the B criteria.

To satisfy the B criteria at step three or, in other words, to be deemed disabled at step three because of the B criteria, a claimant's mental disorder(s) must result in at least two of the following:

1. Marked restrictions of activities of daily living;

2. Marked difficulties in maintaining social functioning;

3. Marked difficulties in maintaining concentration, persistence, or pace;

4. Repeated episodes of decompensation, each of extended duration.

The "activities of daily living" functionality considers a claimant's ease or difficulty in doing things such as cleaning, shopping, cooking, maintaining a residence, self-grooming, and hygiene. Listing 12.00(C)(1).  Social functioning examines how the claimant gets along with others, including family members, friends, neighbors, co-workers, shopkeepers, and strangers, and considers whether there is evidence of a history of altercations, social isolation, or similar dysfunction, as opposed to "cooperative" behavior with others and a sense of social maturity. Listing 12.00(C)(2).  CPP refers to a claimant's abilities to focus and concentrate long enough to complete tasks.  Listing 12.00(C)(3).  An episode of decompensation

12

is a loss of adaptive functioning "manifested by difficulties" with daily living activities, social functioning, or maintaining CPP. Listing 12.00(C)(4).

## B. The ALJ's Evaluation of Mr. Wendel's RFC

In her discussion of evidence pertinent to evaluating Mr. Wendel's RFC (and the severity of his mental impairments), the ALJ heavily relied on two factors as providing significant support for her ultimate determination Mr. Wendel is capable of performing "simple, routine, repetitive" work that requires "only occasional superficial interaction with the public, co-workers, and supervisors":

- Mr. Wendel's work selling Kirby vacuum cleaners door-to-door

- Mr. Wendel's ability to work with computers.

The ALJ's discussion of Mr. Wendel's performance selling vacuum cleaners and working with computers ignored important evidence undermining the rosy picture she painted of the evidence.

### 1. Selling Kirby Vacuum Cleaners

After Mr. Wendel moved from the Bona Vista group home to his mother's house, he attempted to find work. The evidence indicates he received substantial assistance from counselors with Meridian Services in this endeavor. One counselor in particular worked with Mr. Wendel nearly daily to assist him to address basic daily living skills (like attention to his hygiene)[4] and his social functioning to

---

[4]     The counselor's notes report numerous instances of poor hygiene. (*See* R. 395, 398, 399, 400, 405). The counselor also reported her help with Mr. Wendel to create and complete "daily charts with goals and tasks to address need for improvement in ADL's [activities of daily living], completion of chores in the home and time set aside to practice work on his coping skills and effective

improve his hiring chances.[5]  The evidence indicates Mr. Wendel was highly

motivated to get a job;[6] not only would a job improve his personal sense of self worth

but his mother and her husband had become frustrated by his failures to land a job,

and they had threatened to kick him out of their home unless he found one. (*See* R.

420-421; R. 436; R. 459).

In early April 2013, Mr. Wendel was hired to sell Kirby vacuum cleaners

door-to-door, on a commission basis.  (R. 521).

In the ALJ's view, the Kirby job demonstrated Mr. Wendel's capacity to work.

Her decision emphasizes the Kirby job throughout, and says the following about it:

- Mr. Wendel stated he had had a full time job for one week selling Kirby vacuums and he stopped working because he was not paid.  (R. 14).

- Mr. Wendel stated he was able to perform the demonstration while selling vacuums for the Kirby vacuum company, which suggests that the claimant was able to follow directions.  (R. 16).

---

communication."  (R. 406)  In mid-March 2013, when the counselor had gone to Mr. Wendel's mother's home to meet for a counseling session, Mr. Wendel received a telephone call to meet an employer for a job interview.  The counselor "supervised and directed client to take care of ADL's like eating breakfast, washing face, combing hair and coached client on type of clothes to wear and discouraged client from bringing along his music player and headphones which he had planned to wear during the job try-out.  [Counselor] coached client on expected behaviors and encouraged client with a positive attitude and helped him to practice positive self-talk."  (R. 476).

[5]    For example, his counselor worked with Mr. Wendel to "practice the use of appropriate social skills and relationship building skills."  (R. 407)

[6]    Among other notes on this matter, the counselor reported on January 16, 2013, regarding Mr. Wendel's continued struggle to find employment and their discussion of the "possibility of working in a sheltered workshop as [Mr. Wendel] seems to need structure and supervision."  (R. 407).

- Though Mr. Wendel said he cannot work because of his mental health problems, including anxiety and ADHD, he stated "he was able to perform the vacuum demonstration, but was unable to sell any vacuums" and he stated "he did not have any problems performing his job duties selling vacuums." (R. 17).

- There is no indication in the progress notes from Meridian Services that Mr. Wendel cannot complete a normal workday or workweek and "[i]n fact, the claimant reported that he was able to work at the Kirby vacuum company on full time basis" and he "denied having problems completing his job duties."   (R. 21).

There is important evidence—from an objective source—that wholly undermines the notion that the Kirby job evinces Mr. Wendel's ability to work.  Mr. Wendel's counselor at Meridian Services wrote detailed notes about Mr. Wendel's work with Kirby vacuum cleaners, and reported information she learned directly from the employer.  In addition to undermining the ALJ's evaluation, this evidence (discussed below) provides substantial support for Mr. Wendel's argument to this court that Mr. Wendel exaggerates his abilities.  The absence of discussion by the ALJ of this material, contemporaneous information about the Kirby job is a significant hole in her analysis.

The counselor's notes report that Mr. Wendel's first day on the job was an orientation day that occurred on April 6, 2013.  (R. 521).  After orientation, he called his counselor and was extremely upset because he learned at the orientation he needed a driver's license (which he does not have). The counselor accompanied him to the workplace a few days later "to help client ask the questions needed to clarify his concerns" about transportation, and the supervisor assured him that the job did not require him to have his own transportation except to get to work and back home

again.  (R. 537).  At their counseling session at Mr. Wendel's mother's home on April 15, 2013, the counselor learned from Mr. Wendel (who was in a highly agitated but withdrawn and guarded state) that he had had "negative experiences" at work and he was unable to work that day because his glasses were broken and he cannot see well without them.  (R. 545).  Mr. Wendel reported he did not know how his glasses became broken but then agreed with his mother that his coworkers must have put him in a choke-hold.  (*Id.*)  He then told the counselor that he and some coworkers were being driven by the company's owner in a van to a neighborhood to sell vacuum cleaners when the coworkers put him in a choke-hold, poured oil on his shirt, and gave him a wedgee.  (*Id.*)  He said he had asked them to stop.

This report alarmed the counselor and she contacted the company's owner about her concerns for Mr. Wendel's safety.  The owner reported to the counselor that Mr. Wendel had initiated the rough-housing with the coworkers, and he was the one who put a coworker in a choke-hold and in the process, his glasses were knocked off.  (*Id.*)  The owner also reported that although Mr. Wendel was a hard worker, "he has been having a difficult time demonstrating the product [the Kirby vacuum cleaner] and did not seem to have the ability to adequately demonstrate product knowledge and follow the selling script."  (*Id.*).

Because Mr. Wendel then told the counselor it was not true he was an instigator, the counselor went with Mr. Wendel to his job site "to further discuss the incident and to help [Mr. Wendel] establish new limits and boundaries in regard to the rough-housing."  (*Id.*)  That visit raised new questions about the credibility of

16

Mr. Wendel's version.  The counselor told the job supervisor that the rough-housing had resulted in the breaking of Mr. Wendel's glasses, but the supervisor noted that could not be true because the van incident had happened on a Wednesday and Mr. Wendel had worked the following day, on Thursday, and his glasses were intact and he was wearing them.  (*Id.*).  Mr. Wendel became upset and asked about receiving a paycheck.  He was told he would not receive a paycheck for attending the work orientation (recall that he is otherwise a commissioned salesperson and has not sold any vacuum cleaners) because he had missed a day of work (when he did not work because his glasses were broken).  Mr. Wendel was so upset by this news that he "resigned from the company."  (*Id.*)

If these notes were evaluated, the ALJ might have determined Mr. Wendel (a) had no ability to sell vacuum cleaners and was wholly unsuited for that job; (b) did not understand instructions from his employer; (c) was unable to navigate basic employment issues without the assistance of a counselor; (d) was unable to work with others without being distracted and engaging in rough-housing; and (e) has difficulties understanding his shortcomings and tends to exaggerate his abilities.  The ALJ may not reach these conclusions, but she must at least confront the evidence.[7]

---

[7]     This evidence also undermines the ALJ's statement that the fact Mr. Wendel is looking for work "is inconsistent with his allegation of total disability since the application date."  (R. 19).  That statement fails to confront the evidence, most pronounced in the Meridian Services notes, that Mr. Wendel does not understand his shortcomings.

17

### 2.  Mr. Wendel's Facility with Computers

The ALJ also relied, repeatedly, on Mr. Wendel's statements that he "has no problem rebuilding computers" in deciding the extent of Mr. Wendel's abilities to work.  (R. 15, 16, 21).  There is strong evidence—not mentioned by the ALJ—that Mr. Wendel actually does not have a facility with computers and he tends to exaggerate his abilities.

When Mr. Wendel moved from North Central High School to Kokomo High School, he told the case conference committee at Kokomo High School about his enjoyment of working with computers.  The committee learned, however, from North Central that Mr. Wendel had not done well in a computer class at North Central, and he was not a good candidate for taking classes on-line "because he does not have the ability to focus for long periods of time while on the computer."  (R. 245).

Mr. Wendel's counselor from Meridian Services also commented on the contrast between Mr. Wendel's statements about his computer abilities and her contrary observation of Mr. Wendel.  The counselor accompanied Mr. Wendel to a Walmart store to apply for a job.  The application process was done by computer, and Mr. Wendel "struggled with log-in instructions when creating a user name," even though he told the counselor he had even previously applied for employment at Walmart by the same means.  (R. 412).[8]

---

[8]     There are other instances within the Meridian Services counseling notes about Mr. Wendel's exaggeration of his computer skills.  In November 2012, he told the counselor that he had worked in a factory before, had helped to start a small

18

This contrary information, including strong evidence of Mr. Wendel's exaggerations, should have been evaluated by the ALJ.  It constitutes a line of evidence that undermines her conclusions.

## C. The ALJ's Evaluation of Medical Opinions Pertinent to the RFC.

There is also a logical flaw in the ALJ's RFC analysis that undermines her conclusion.  It concerns the ALJ's "reduction" of Mr. Wendel's functioning based on a report by psychologist Jillian Yee, who conducted a mental status examination of Mr. Wendel on August 6, 2012.  (R. 275-278).  Dr. Yee's report contains a Medical Source Statement, which states:

> Cognitive abilities appear to be within the low average range.  He appears to have a great deal of trouble interacting socially.  He does not display appropriate social and emotional reciprocity.  He also can experience anxiety when dealing with people.  Working in an environment with the public may be difficult.  He had a difficult time attending and concentrating throughout the examination.  He was also impulsive.  His level of persistence may be negatively impacted by pessimism, fatigue, low motivation, social skills impairments, anxiety and physical issues.

(R. 278).

The ALJ stated that based on Dr. Yee's report, she "reduced" Mr. Wendel's RFC to "only occasional superficial interaction with the public, co-workers and

---

business operation that produced moonshine, and had written the computer software for the moonshine business.  (R. 396).  In March 2013, Mr. Wendel told the counselor "an elaborate and highly unlikely story of a large Yahtzee tournament and client's work on a government owned super computer which client used to create a Yahtzee computer program which client was able to beat."  (R. 491).  Mr. Wendel was adamant the stories were true, and also said he had helped the local fire department assess damage at abandoned buildings.  (*Id*.).

supervisors" and she "reduced" the RFC to "performing simple, routine, and repetitive tasks." (R. 15, 16). But, in fact, there was no "reduction."

The state agency reviewing psychologist, Dr. Kennedy, had found that Dr. Yee's Medical Source Statement was not entitled to any weight based on her determination the "MSS [was] not consistent" with the medical evidence of record and Mr. Wendel's daily living activities. (R. 303). His functioning, in Dr. Kennedy's view, was higher than reported by Dr. Yee. Dr. Kennedy opined that the "totality of the evidence" indicated instead that Mr. Wendel is able to do "unskilled work" because he can "understand, carry out and remember simple instructions," "make judgments commensurate with the functions of unskilled work," and "respond appropriately to brief supervision and interactions with coworkers and work situations." (R. 303). Dr. Kennedy further noted that Mr. Wendel may prefer to work in a position that requires minimal interaction with others." (*Id.*)

Dr. Kennedy's opinion that Mr. Wendel can do unskilled work is equivalent to the ALJ's ultimate determination Mr. Wendel can perform "simple, routine, and repetitive tasks" with only occasional superficial interaction with coworkers and supervisors. *See O'Connor-Spinner v. Astrue,* 627 F.3d 614, 620 (7th Cir. 2010) (discussing cases regarding equivalent use of the terms "unskilled" work and "simple, repetitive tasks"). According to Social Security Ruling 85-15, "unskilled work" involves the ability to "understand, carry out and remember simple instructions," "respond appropriately to supervision, coworkers," and "deal with

changes in a routine work setting."[9]  It thus embodies the very RFC description
provided by the ALJ of "simple, routine, and repetitive tasks" with an ability to
interact on an occasional and superficial basis with supervisors and coworkers.  As
SSR 85-15 also explains, if there is a "substantial loss of ability" in these areas
because of mental impairments, then the occupational base is severely limited and
would justify a finding of disability.

The ALJ's use of an RFC substantially equivalent to Dr. Kennedy's
determination—who found that Dr. Yee's opinion had no weight—while also
"reducing" Mr. Wendel's RFC because of Dr. Yee's opinion is illogical.  Further, as
noted, there seems virtually no room to "reduce" Dr. Kennedy's opinion that Mr.
Wendel is capable of only unskilled work.

These logical errors, along with the ALJ's failure to address compelling and
contrary evidence in the record regarding Mr. Wendel's demonstrated work abilities
because of the Kirby job or computer acumen, lead the court to determine the ALJ's
RFC is not supported by substantial evidence.

Because the RFC is not supported by substantial evidence, the ALJ's decision
at step five—which depends on an appropriate RFC—that Mr. Wendel is not
disabled must be reversed and remanded.

---

[9]      *See* https://www.socialsecurity.gov/OP_Home/rulings/di/02/SSR85-15-di-
02.html.

21

**IV.**   <u>**Step Three Analysis**</u>

Because the court determines the ALJ's RFC analysis is not supported by substantial evidence, it is not necessary to analyze whether her step three decision is supported by substantial evidence.  That issue should be addressed on remand. The court notes that the ALJ relied substantially on Dr. Kennedy's Psychiatric Review Technique in making her step three findings. Because at the time of Dr. Kennedy's review, Mr. Wendel had not yet engaged in extensive counseling with Meridian Services, Dr. Kennedy was not able to review the hundreds of pages of Meridian Services documents reflecting counselors' close work with Mr. Wendel on a nearly daily basis over an extensive period of time.  At the time of Dr. Kennedy's review, Mr. Wendel had just begun living with his mother after having spent the prior two years living in highly structured and regimented residential-home or group-home settings.  The Meridian Services records are the only ones that describe Mr. Wendel's functioning in a non-regimented and non-structured setting.  A review of those records by a psychologist or psychiatrist is appropriate.

<u>Conclusion</u>

For the foregoing reasons, the Magistrate Judge recommends that the District Judge REVERSE AND REMAND for further proceedings under sentence four of 42 U.S.C. §405(g) the Commissioner's decision that Mr. Wendel is not disabled.

Any objections to this Report and Recommendation must be filed in accordance with 28 § U.S.C. 636(b)(1) and Fed. R. Civ. P. 72(b).  The failure to file

objections within fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for that failure.  Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.

Dated:  February 10, 2016

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:
All ECF-registered counsel of record by email through the court's ECF system